UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHEILA CLARKE, as Personal Representative
for The Estate of JANIKA NICOLE EDMOND, deceased,

     Plaintiff,

v

MICHIGAN DEPARTMENT OF CORRECTIONS,
WARDEN ANTHONY STEWART, individually and
in his official capacity, Deputy Warden, DAVID JOHNSON;
individually and in his official capacity,  Deputy Warden
OSTERHOUT, individually and in his official capacity, CO
DIANNA CALLAHAN, individually and in her official
capacity, A/RUM KORY MOORE, individually and in his
official capacity, CO R'KIA TAYLOR, individually and in his
official capacity, SGT. KRISTA SURBIC, individually and in
her official capacity,  SGT. LOREN HAILES, individually
and in his official capacity, CO HEATHER WASHINGTON,
individually and in her official capacity, CO JOHANNA
BARTEL, individually and in her official capacity, CO
ALEXIA JOHNSON, individually and in her official capacity,
CO LASHAWNA DONALD, individually and in her official
capacity, CO TRACY MAUPINS, individually and in her
official capacity, RN MARCIA PORTER, individually
and in her official capacity,

     Defendants.

Case No.:
Hon.

**COMPLAINT AND JURY
DEMAND**

| | |
|---|---|
| Cary S. McGehee P42318 | David Steingold P29752 |
| Beth M. Rivers P33614 | Law Offices of David S. Steingold PLLC |
| Pitt McGehee Palmer & Rivers P.C. | Attorney for Plaintiff |
| Attorneys for Plaintiff | 400 Monroe St Ste 280 |
| 117 West Fourth Street, Suite 200 | Detroit, MI 48226-2962 |
| Royal Oak, Michigan 48067 | Main: (313) 962-0000 |
| (248) 398-9800 | detroitdefender@yahoo.com |
| cmcgehee@pittlawpc.com | |
| brivers@pittlawpc.com | |

## JURISDICTION

1.      This action arises under the United States Constitution, particularly under the provisions of the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution and under the laws of the United States, particularly under the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 1988.

2.      Jurisdiction is conferred by Title 28 U.S.C. §§ 1331 and 1343.

3.      Plaintiff brings suit against each Defendant in both their individual and official capacities.

4.      All of the acts by Defendants as set forth herein, were executed by Defendants under the color of law and the pretense of the statutes, ordinances, regulations, laws, customs, and usages of the State of Michigan, and by virtue of and under the authority of Defendants' employment with the State of Michigan. The Michigan Department of Corrections, is responsible for, and does in fact, hire, train, supervise, and discipline wardens, deputy wardens, sergeants, assistant resident unit managers and resident unit managers, registered nurses and corrections officers of all grades in the performance of their duties.

5.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b) and because all events and controversies occurred in this jurisdiction.

6.      The amount in controversy is in excess of $75,000, exclusive of Plaintiff's claims for costs, attorney fees, interest and punitive damages.

## PARTIES

7.    Plaintiff, Sheila Clarke, is the duly appointed personal representative of the estate of the decedent, Janika Edmond. Plaintiff is a resident of the City of Adrian, Michigan.

8.    At all times relevant hereto, Plaintiff's decedent, Janika Edmond ("EDMOND") was citizen and a resident of Ypsilanti, Washtenaw County, State of Michigan and of the United States and is entitled to all rights, privileges, and immunities accorded to all citizens of the United States.

9.    Defendant, Michigan Department of Corrections ("MDOC"), is an agency formed pursuant to the laws of Michigan, and one of the functions of the MDOC is to organize, train, operate and discipline staff correctional officer personnel in correctional facilities, including the Women's Huron Valley Correctional Facility ("WHV"). The MDOC is also responsible for the development and implementation of policies and procedures for the operation and management of its facilities and its employees. It is further responsible for the care, custody and protection of individuals including EDMOND.

10.    Defendant, Warden Anthony Stewart ("STEWART"), was, at all relevant times, employed by the MDOC as the Warden of WHV and is, upon information and belief, responsible for the operation of WHV, and the supervision, training, discipline, and other functions of WHV's employees, staff and/or agents, and ensuring that

2

Defendants enforced and abided by the policies and regulations of the MDOC, and the State of Michigan, and the United States. In addition, STEWART's duties and responsibilities include the development and implementation of policies and procedures for the operation and management of WHV and its employees. He is further responsible for the care, custody and protection of individuals including EDMOND.

11. Defendant, Deputy Warden David Johnson ("JOHNSON"), was, at all relevant times, employed by the MDOC as a Deputy Warden of WHV and is, upon information and belief, responsible for the operation of WHV,  the supervision, training, discipline, and other functions of WHV's employees, staff and/or agents, and ensuring that Defendants enforced and abided by the policies and regulations of the MDOC, and the State of Michigan, and the United States. In addition, JOHNSON's duties and responsibilities include the development and implementation of policies and procedures for the operation and management of WHV and its employees. He is further responsible for the care, custody and protection of individuals including EDMOND.

12. Defendant, Deputy Warden Ousterhout ("OUSTERHOUT"), was, at all relevant times, employed by the MDOC as a Deputy Warden of WHV and is, upon information and belief, responsible for the operation of WHV, and the supervision, training, disciplining, and other functions of WHV's employees, staff and/or agents, and ensuring that Defendants enforced and abided by the policies and regulations of the MDOC, and the State of Michigan, and the United States. In addition,

3

OUTSTERHOUT's duties and responsibilities include the development and implementation of policies and procedures for the operation and management of WHV and its employees. He is further responsible for the care, custody and protection of individuals including EDMOND.

13.     Defendant, C.O. Dianna Callahan ("CALLAHAN"), was, at all relevant times, employed by the MDOC as a corrections officer at WHV and was therefore responsible for the care, custody and protection of individuals, including EDMOND, and protecting them from unlawful treatment.

14.     Defendant, C.O. Kory Moore ("MOORE"), was, at all relevant times, employed by the MDOC as a corrections officer at WHV and was therefore responsible for the care, custody and protection of individuals, including EDMOND, and protecting them from unlawful treatment.

15.     Defendant, C.O. R'Kia Taylor ("TAYLOR"), was, at all relevant times, employed by the MDOC as a corrections officer at WHV and was therefore responsible for the care, custody and protection of individuals, including EDMOND, and protecting them from unlawful treatment.

16.     Defendant, Sgt. Krista Surbic ("SURBIC"), was, at all relevant times, employed by the MDOC as a sergeant at WHV and was therefore responsible for ensuring that Defendants enforced and abided by the policies and regulations of the MDOC, the State of Michigan, and the United States. In addition, SURBIC's duties

4

and responsibilities include the development and implementation of policies and procedures for the operation and management of WHV and its employees. She is further responsible for the care, custody and protection of individuals including EDMOND, and protecting them from unlawful treatment.

17.     Defendant, Sgt. Loren Hailes ("HAILES"), was, at all relevant times, employed by the MDOC as a sergeant at WHV and was therefore responsible for ensuring that Defendants enforced and abided by the policies and regulations of the MDOC, the State of Michigan, and the United States. In addition, HAILES's duties and responsibilities include the development and implementation of policies and procedures for the operation and management of WHV and its employees. She is further responsible for the care, custody and protection of individuals including EDMOND, and protecting them from unlawful treatment.

18.     Defendant, C.O. Heather Washington ("WASHINGTON"), was, at all relevant times, employed by the MDOC as a corrections officer at WHV and was therefore responsible for the care, custody and protection of individuals, including EDMOND, and protecting them from unlawful treatment.

19.     Defendant, C.O. Johanna Bartel ("BARTEL"), was, at all relevant times, employed by the MDOC as a corrections officer at WHV and was therefore responsible for the care, custody and protection of individuals, including EDMOND, and protecting them from unlawful treatment.

5

20.    Defendant, C.O. Alexia Johnson ("JOHNSON"), was, at all relevant times, employed by the MDOC as a corrections officer at WHV and therefore responsible for the care, custody and protection of individuals, including EDMOND, and protecting them from unlawful treatment.

21.    Defendant, C.O. Lashawna Donald ("DONALD"), was, at all relevant times, employed by the MDOC as a corrections officer at WHV and was therefore responsible for the care, custody and protection of individuals, including EDMOND, and protecting them from unlawful treatment.

22.    Defendant, C.O. Tracy Maupins ("MAUPINS"), was, at all relevant times, employed by the MDOC as a corrections officer at WHV and was therefore responsible for the care, custody and protection of individuals, including EDMOND, and protecting them from unlawful treatment.

23.    Defendant, RN Marcia Porter ("PORTER"), was, at all relevant times, employed by the MDOC as a registered nurse at WHV and was therefore responsible for the care, custody and protection of individuals, including EDMOND, and protecting them from unlawful treatment.

### FACTUAL ALLEGATIONS REGARDING THE DEATH OF JANIKA NICHOLE EDMONDS

24.    Plaintiff's decedent, Janika Edmond, was born on August 8, 1990 and was 25 years old at the time of the incident giving rise to this claim.

25.     Plaintiff, Sheila Clarke, was EDMOND'S aunt and childhood legal guardian.

26.     On or about February of 2013, EDMOND entered the WHV.

27.     EDMOND had a release date as early as April, 2016.

28.     At or around the time that she was incarcerated at the WHV, Defendants were provided with a MDOC Sheriff's Questionnaire for Delivered Prisoners, which, pursuant to policy, has to accompany the prisoner to reception at WHV, and which notified the WHV that while she had been jailed in the Lenawee County jail, EDMOND had made multiple attempts and threats of suicide.  The Questionnaire specified that, in one instance, EDMOND tried to strangle herself with a sheet. It further stated that EDMOND had received medical and mental health treatment at the jail.

29.     Despite Defendants' knowledge of EDMOND's high risk, they failed to adequately address the risk or take steps to provide adequate treatment, increasing the likelihood of continuing suicide attempts.

30.     Prior to her suicide death, EDMOND had an extensive history of self-injurious behavior, suicidal ideation and attempts while incarcerated at WHV. This history included, but is not limited to:

    a. On July 18, 2014,  EDMONDS attempted to hang herself by wrapping a towel around her neck;

b.  On October 3, 2014, EDMOND attempted suicide by wrapping a cloth material around her neck;

c.  On December 30, 2014, EDMOND attempted suicide by hanging herself;

d.  On June 29, 2015, EDMOND wrapped plastic around her neck and pulled it tightly.

e.  On July 23, 2015, EDMOND tolda corrections officer she needed a "Bam Bam" and was put on 1:1 observation;

f.  On July 27, 2015, EDMOND tied a bra around her neck in a shower stall;

g.  On August 11, 2015, EMOND asked to be put on suicide precautions for her own safety; and

h.  On August 18, 2015, EDMOND wrapped a sheet around her neck while lying in bed.

31.    Prior to her suicide death in November of 2015, WHV had placed EDMOND on suicide precaution and suicide observation on multiple occasions. Prior to her suicide death, Defendants were well aware that EDMOND was at a high risk for a suicide attempt, yet failed to take adequate steps to address the risk, including but not limited to proper supervision and treatment.

32.    Defendants in fact exacerbated Plaintiff's mental health conditions by the mistreatment and disregard for her condition.

8

33.     Prior to and during her incarceration, EDMOND suffered from mental illness and had been diagnosed as suffering from major depressive and mood disorders, among other things, for which she was prescribed medication.

34.     During her incarceration at WHV, EDMOND was on mental health outpatient status and being supervised by a prison doctor.

35.     Prior to her suicide death in November of 2015, Defendants were well aware that EDMOND suffered from mental illness.

36.     On September 11, 2015, Defendant MDOC issued a Mental Health Management Plan for EDMOND stating under the section entitled "Behavior to Observe and Report" disruptive behavior, refusal to take medication, and "any behavior or verbalization of harm to self or others".

37.     Despite knowledge of Janika Edmond's mental illness and suicide attempts, Defendants failed to properly treat her mental illness.

38.     At the time of her untimely death, EDMOND was incarcerated at WHV, Level IV.

39.     On November 2, 2015, EDMOND had been assigned to Unit C Segregation.

40.     Contrary to MDOC policy,  and despite Defendants' knowledge of EMOND being a high risk for suicide, while EDMOND was waiting to be placed in a segregation cell, Defendants placed her in a shower area/module without adequate

9

supervision or precautions.  In addition, although Defendants knew that in the past EDMOND had used a towel and/or other cloth material to attempt suicide by hanging herself, Defendants placed her in the shower area/module without removing all of her clothing.

41.    On November 2, 2015,  at 12:49 p.m., as verified on  the MDOC video camera located  in the Segregation Control Unit,  Defendant CO CALLAHAN walked EDMOND to a  segregation unit shower/module

42.    The segregation unit shower is located near the Segregation Control Unit where COs and other MDOC staff members are assigned to work.

43.    On the afternoon of November 2, 2015, upon information and belief, Defendants CALLAHAN, MOORE, TAYLOR, SURBIC, HAILES, WASHINGTON, BARTEL, JOHNSON, DONALD, MAUPINS, and PORTER were all working at the Segregation Control Unit or in the vicinity of the shower/module where Defendant CALLAHAN placed EDMOND.

44.    From 12:49 pm to 2:03 pm, as verified by the MDOC video,  multiple staff members,  including  Defendants  CALLAHAN  and  MOORE,  were  aware  that EDMOND was in a distressed state and Defendants did not alert mental health or take any steps to evaluate, assess or address the distress, despite knowledge of EDMOND's high risk of self-harm.

45.    At   2:03 p.m., as verified by the MDOC video,   while Defendants, including Defendant CALLAHAN,  are in the segregation shower/module, EMOND yelled  that she  "**wants  Bam Bam" (a "Bam Bam" is a slang term for a suicide prevention vest), and that she should  kill herself**.  Plaintiff exhibited clear intent to engage in self harm and Defendants, despite their knowledge of her high risk for such actions, failed to take any steps to prevent the injury, including but not limited to removing material that was readily available for executing the harm, contacting mental health, placing plaintiff in an observation area or taking any other steps to prevent the harm.

46.    Upon information and belief, EDMOND's cry for a Bam Bam and statement that she should kill herself were heard by all of the MDOC staff personnel in the area, including the Defendants CALLAHAN, MOORE, TAYLOR, SURBIC, HAILES, WASHINGTON, BARTEL, JOHNSON, DONALD, MAUPINS, and PORTER.

47.    Defendant MDOC's policy requires staff to immediately respond to life-threatening suicidal behavior.

48.    Specifically, Policy Directive ("PD") 04.06.183 (L), states: "When a mental health emergency is suspected, custody staff shall place the prisoner in an observation room, or its reasonable equivalent in safety restrictions where an observation room is not available, e.g. in the Camp Program. Necessary precautions

11

shall be taken to prevent him/her from engaging in behavior which is injurious to self, others, or property in accordance with PD 04.05.112, Managing Disruptive Prisoners and PD 04.06.115, Suicide Prevention."

49.   PD 04.06. 115(O) states in pertinent part:" "If a prisoner engages in suicidal or self-injurious behavior which is life threatening, **staff shall immediately respond** as set forth in PD 03.04.125 "Medical Emergencies".

50.   At no time relevant hereto, did any MDOC staff member immediately respond to EDMOND's life threatening suicidal behavior.

51.   Instead of complying with MDOC policy and responding to EDMOND's pleas for help, at 2:04 p.m., as verified by the MDOC video, Defendant CALLAHAN yelled to her co-workers, including Defendants, and other prisoners in the area, including EDMOND,  "Somebody owes me lunch!"

52.   CALLAHAN's callous disregard of EDMOND's obvious pain and suffering rose to the level of reckless and intentional harm which was the cause of EDMOND's self-injurious behavior.

53.   At 2:04 p.m.,  as verified by the MDOC video,  Defendant CALLAHAN waved  and pumped her fist three times into the air with her thumb up while nodding her head and looking in the direction of the Segregation Control Unit area. She repeated: "Somebody owes me lunch!"

54.     Upon information and belief, CALLAHAN made a bet with MOORE that EDMOND would become suicidal.

55.     At 2:05 p.m., as verified by the MDOC video, Defendants CALLAHAN and MOORE had a conversation about a Subway sandwich.

56.     At 2:07 p.m., as verified by the MDOC video, choking sounds can be heard coming from the shower/module area.

57.     Defendants CALLAHAN, KORY, MOORE, TAYLOR, SURBIC, HAILES, WASHINGTON, BARTEL, JOHNSON, DONALD, MAUPINS, AND PORTER all heard these choking sounds, and nevertheless, and in reckless disregard of EDMOND's health and safety, failed to take any steps to enter the cell or check on EDMOND or alert mental health or take any steps to evaluate, assess or address the distress, despite knowledge of EDMOND's high risk of self-harm.

58.     At 2:10 p.m., as verified by the MDOC video, more choking sounds can be heard coming from the shower/module area.

59.     Defendants CALLAHAN, KORY, MOORE, TAYLOR, SURBIC, HAILES, WASHINGTON, BARTEL, JOHNSON, DONALD, MAUPINS, AND PORTER all heard these choking sounds, and nevertheless, and in reckless disregard of EDMOND's health and safety, failed to take any steps to enter the cell or check on EDMOND or alert mental health or take any steps to evaluate, assess or address the distress, despite knowledge of EDMOND's high risk of self-harm.

60.    At 2:11 p.m., as verified by the MDOC video, more choking sounds can be heard coming from the shower/module area.

61.    Defendants CALLAHAN, KORY, MOORE, TAYLOR, SURBIC, HAILES, WASHINGTON, BARTEL, JOHNSON, DONALD, MAUPINS, AND PORTER all heard these choking sounds, and nevertheless, and in reckless disregard of EDMOND's health and safety, failed to take any steps to enter the cell or check on EDMOND or alert mental health or take any steps to evaluate, assess or address the distress, despite knowledge of EDMOND's high risk of self-harm.

62.    At 2:22 p.m., as verified by the MDOC video, almost 20 minutes after EDMOND asked for a suicide prevention vest and said that she should kill herself, Defendant SURBIC entered the shower/module area and discovered that EDMOND had hung herself with her bra. At that time, Defendant SURBIC radioed for "health care and yard staff in Seg."

63.    MDOC personnel administered CPR and applied an automated external defibrillator to resuscitate EDMOND.

64.    At 2:45 p.m., Huron Valley Ambulance paramedics entered the shower unit and declared six minutes later that EDMOND had a pulse. They then transported EDMOND to St. Joseph Mercy Hospital.

65.    On November 2, 2015, at or around 3:30 p.m., EDMOND's biological mother, Christina Edmond, came to WHV to visit her daughter.

14

66.     Christina Edmond waited for over an hour at WHV to visit with her daughter. At no time did any MDOC staff notify her that her daughter had just attempted suicide and had been transported to the hospital. Instead, Ms. Edmond was told to go home because her daughter was not receiving visitors.

67.     No members of EDMOND's family were notified on November 2, 2015 by the MDOC that EDMOND had attempted suicide and was in the hospital.

68.     MDOC did not notify EDMOND's family of her suicide attempt and her precarious state at St. Joseph Mercy Hospital until November 3, 2016, nearly 24 hours after her suicide attempt.

69.     On November 6, 2015, at St. Joseph Mercy Hospital, EDMOND was declared brain dead.

70.      On November 11, 2015, EDMOND's life-monitoring devices were removed and she was pronounced dead.

71.     EDMOND's death is a direct result of Defendants' explicit disregard of MDOC policy, gross negligence, and deliberate indifference to EDMOND's health and welfare.

72.     Defendants' failure to properly treat EDMOND's mental illness and its actions in punishing her because of it, exacerbated her mental difficulties, including her suicidal ideations, and caused her suicide.

73.     Defendants MDOC and Warden STEWART deliberately concealed EDMOND's suicide attempt from her family for nearly 24 hours, preventing her family from becoming aware of EDMOND's serious condition and being with her during the last days of her life.

74.     On November 9, 2015, Defendant CALLAHAN was suspended from employment and on March 10, 2016, she was terminated from employment with the MDOC as a result of her deliberate indifference, gross negligence, and misconduct which caused EMOND's untimely death.

75.     On December 21, 2015, Defendant MOORE was suspended from employment and on March 10, 2016, she was terminated from employment with the MDOC as a result of her deliberate indifference, gross negligence, and misconduct which caused EMOND's untimely death.

76.     Notwithstanding the obvious criminal implications surrounding EDMOND's death, and contrary to MDOC policy, and as a means to conspire to cover up Defendants' violations of EDMOND's constitutional rights, deliberate indifference, and its gross negligence, Defendants failed to immediately notify the Michigan State Police ("MSP") of EDMOND's suicide so that it could conduct a timely investigation into the circumstances of EDMOND's death.

77.     On November 11, 2015, the MSP learned about EDMOND's suicide when the Washtenaw Medical Examiner contacted one of its Troopers because he was unable

to obtain the information that he needed from the WHV facility in order to perform an autopsy and wanted to know who from the MSP was conducting the investigation.

78.    The MSP had to take the initiative to contact the MDOC to find out about EDMOND's suicide and to start its investigation.

79.    After the MDOC notified the MSP of EDMOND's suicide, it intentionally engaged in behavior intended to obstruct the MSP investigation  into the matter and to cover up its misconduct, deliberate indifference, and gross negligence, by among other things:

a.    Refusing to timely provide  the MSP and the Washtenaw Medical Examiner with the MDOC's Critical Incident Report;

b.    Failing to preserve a potential crime scene and the evidence located therein;

c.    Refusing to cooperate with the MSP's efforts to obtain evidence requiring it to obtain a search warrant; and

d.    Failing, as asked by the MSP, to secure an   office   area   containing investigative evidence while the MSP obtained a search warrant.

## COUNT I

### 42 U.S.C. § 1983 CONSTITUTIONAL DEPRIVATIONS

80.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully stated herein.

81.    Defendants are persons within the meaning of the term under 42 U. S.C. Section 1983.

82.    Plaintiff's decedent, EDMOND, was entitled to constitutionally protected rights as a citizen of the United States of America, such as a right to personal safety and right to medical care and protection encompassed in the substantive component of the Due Process Clause of the Fourteenth Amendment.

83.    As an incarcerated prisoner in WHV, Plaintiff's decedent was also owed rights under the Eighth Amendment ensuring protection from cruel and unusual punishment, including the right to have reasonable measures taken to guarantee her safety and to treat her serious medical needs.

84.    Defendants, as Plaintiff's decedent's custodial caretakers, owed Plaintiff's decedent an affirmative duty to secure for her the constitutionally protected rights identified above.

85.    Defendants, knowing Plaintiff's decedent's medical needs, had a duty under state law, to instruct, supervise, train, direct, and conduct themselves and/or their employees to assure the delivery of medical care and supervision to Plaintiff's decedent that is consistent with her health and safety and which avoided the unreasonable risk of severe harm to her.

86.    The acts and omissions attributable to the Defendants under 42 USC Section 1983 were unreasonable and performed knowingly, deliberately,

intentionally, maliciously, with gross negligence, callousness, and reckless indifference to Plaintiff's well-being and in complete disregard of Plaintiff's safety, with wanton intent for Plaintiff to suffer the unnecessary and intentional infliction of pain, failure to obtain timely medical treatment, and failure to properly train, supervise, develop and implement policies providing adequate medical and psychiatric treatment to a prisoner and by reason of which Plaintiff is entitled to compensatory and punitive damages.

87.    The conduct of the Defendants, individually and/or as agents of the State of Michigan, deprived Plaintiff's decedent, EDMOND, of her clearly established rights, privileges and immunities in violation of the Fourth, Eighth and Fourteenth Amendments of the United States Constitution and of 42 USC Section 1983.

88.    The conduct of the Defendants, individually and/or as agents of the State of Michigan, exhibited a deliberate indifference by intentional acts and omissions and otherwise grossly negligent behavior so as to breach Plaintiffs' decedent's right to basic safety and causing constitutional deprivation of her individual rights.

89.    Defendants not only breached this duty but also acted, under color of law, with gross negligence and deliberate indifference to Plaintiff's decedent's safety, protection and medical needs by:

19

a. Failing to properly render the proper medical attention to a prisoner who was diagnosed and generally recognized as mentally ill in violation of MDOC Policy Directive 03.03.130;

b. Failing to properly train correction officers in the evaluation of whether an prisoner needs medical treatment in violation of MDOC Policy Directive 04.06.115;

c. Failing to provide decedent with appropriate supervision given her medical needs and suicidal ideation;

d. Failing to implement procedures necessary to effectively enforce requirements set forth in MDOC Policy Directive 04.06.115;

e. Failing to properly address Plaintiff's decedent's immediate suicide risk recklessly disregarding decedent's suicidal history, decedent's Mental Health Management Plan, MDOC Policy Directives 04.06.115 and 04.06.183, and decedent's health and safety ;

f. Failing to promptly respond to Plaintiff decedent's recognizable medical emergency in reckless disregard and deliberate indifference to decedent's health and safety and in violation of MDOC Policy Directive 03.04.125;

g. Failing to place Plaintiff's decedent in a safe environment so that she could not harm herself or others in violation of MDOC Policy Directive 04.06.183;

20

h.  Failing to properly supervise Plaintiff's decedent throughout the afternoon of November 2, 2015 knowing the risk decedent posed to herself;

i.  Failing to notify the Michigan State Police following Plaintiff's decedent's attempted suicide in violation of MDOC Policy Directive 03.04.125; and

j.  Acting or failing to act in other ways to expose Plaintiff's decedent to a known, extreme risk to her health and safety that may or will become known during discovery.

90.  As a direct and proximate result of the aforementioned conduct and omissions of Defendants, individually and/or as agents of the State of Michigan, Plaintiff's decedent, Janika Edmond, was deprived of her constitutionally protected rights as described above and suffered severe and permanent brain injuries, pain and suffering, medical bills and costs, economic damages, and the prisoner's death.

WHEREFORE, Plaintiff requests the following relief:

a.  Extreme pain and suffering and mental health and emotional damages resulting from Defendants' acts and omissions up to and including her death;

b.  Loss of comfort, society and companionship;

c.  Reasonable medical, funeral and burial expenses;

d.  Compensatory and punitive damages; and

e.  Any and all other damages otherwise recoverable under USC Section

1983 and Section 1988, including an award of attorney fees and costs.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter

judgment in her favor and against Defendant, including punitive damages under 42

U.S.C. § 42, in excess of $75,000.00 together with interest, costs and attorney's fees.

## COUNT II

### FAILURE TO TRAIN, INADEQUATE POLICIES AND/OR PROCEDURES, CUSTOMS AND PRACTICES AND FAILURE TO SUPERVISE- DELIBERATE INDIFFERENCE- MICHIGAN DEPARTMENT OF CORRECTIONS

91.  Plaintiff hereby re-alleges each and every allegation contained in

paragraphs 1 through 80 of this Complaint as if fully stated herein.

92.  Pursuant to 42 USC § 1983, as well as the Fourth and Fourteenth

Amendments to the United States Constitution, Defendant MDOC owed EDMOND

certain duties to properly supervise, monitor and train its correctional officers and staff

so as to monitor and supervise the jail's prisoners so that they would detect serious

medical conditions and facilitate prompt and immediate medical attention and/or

transport to a hospital ER.

93.  That Defendant, in its representative and official capacity, has maintained

a custom and policy of improper training and supervision of its employees. Defendant

is not protected by governmental immunity when following a policy that deprives

individuals of their constitutional rights. *Monell v N.Y. City Dep't of Soc. Servs.,* 436

658, 690-91, 692 (1978).

94.   Defendant MDOC, was aware of previous incidents where individuals

who were incarcerated at the WHV were not afforded proper medical treatment,

specifically as to mental health referrals and observations.

95.   Defendant MDOC was aware of the custom and practice of corrections

officers/wardens, deputy wardens and/or staff ignoring suicidal ideation statements,

similar to the actions of Defendants, CALLAHAN, MOORE, TAYLOR, SURBIC,

HAILES, WASHINGTON, BARTEL, JOHNSON, DONALD, MAUPINS, AND

PORTER.

96.   Defendant owed EDMOND the following duties and obligations:

  a.  To use due care and caution;

  b.  To adequately and properly create and  promulgate guidelines and policies

       that comply with the requirements of 42 U.S.C. § 1983 regarding the

       incarceration of prisoners and the supervision of prisoners, especially

       those who are mentally and emotionally and physically unstable and

       especially those who are diagnosed as having psychiatric or psychological

       problems;

  c.  To adequately and properly create and promulgate guidelines and policies

       that comply with the requirements of 42 U.S.C. § 1983 regarding the

incarceration of prisoners who have threatened self-injury or suicide to insure that MDOC staff personnel can immediately and appropriately respond and take action when a prisoner is distress and has threatened self-injury or suicide.

d. To adequately and properly train and supervise correction officers and employees of the WHV under their supervision on the proper method of supervising prisoners and providing for their medical needs and on effectively controlling prisoners who have or are suspected to have psychological or psychiatric problems;

e. To avoid hiring or selecting individuals who it knows or should know are incapable of performing their responsibilities or who are likely to misuse or abuse the power conferred on them as employees of the WHV.

97. MDOC breached these duties via its policies, procedures, regulations, customs and/or lack of training and thus exhibited a reckless indifference toward its prisoners, and EDMOND specifically, in the following ways, including but not limited to:

a. MDOC's failure to staff the jail with competent medical personnel so that a mental health professional;

b.  MDOC's failure to monitor their correctional officers and medical personnel to ensure that they adequately monitor and supervise prisoners who have serious medical needs;

c.  MDOC's failure to have proper policies and procedures, and training to deal with prisoners in the observation cell and ensure that the policies and/or procedures are followed, which include serial examinations by competent and licensed medical and mental health personnel like RNs, Psychologists and/or Doctors as well as its failure to ensure the correctional officers conduct timely and adequate rounds and record their observations of the prisoners every 15 minutes as required by their own policies and/or procedures;

d.  MDOC's failure to require that an RN, Doctor or Mental Health Professional perform a full and complete examination of a prison held in a medical observation cell, at least once per day;

e.  MDOC's failure to have proper policies and procedures in place to deal with jail overcrowding in the high observation units of the facility;

f.  MDOC's failure to have proper policies and procedures, and training to deal with prisoners who have threatened self-injury or suicide to insure that MDOC staff personnel can immediately and appropriately respond

and take action when a prisoner is distress and has threatened self-injury or suicide.

g.  MDOC's failure to fully investigate and discipline its correctional officers and/or medical/mental health personnel who do not abide by its policies and procedures relative to providing medical care for serious conditions; and,

h. All other breaches learned through the course of discovery.

98.    Defendant MDOC trained their officials and/or employees and agents in such a reckless and grossly negligent matter, that it was inevitable that the officials would place a suicidal prisoner in a place where she would not be supervised when it was obvious that such a prisoner needed constant supervision. Notwithstanding EDMOND's contemplation of suicide and request for a suicide prevention vest, Defendant repeated and acquiesced in the continued practice of not placing potentially suicidal prisoners, such as EDMOND, under close supervision and acquiesced in the repeated and continued practice of not adequately treating suicidal prisoners in obvious need of treatment.

99.    The failure of the Defendant MDOC to provide training and supervision regarding the prevention of suicides amounts to deliberate indifference to the safety and lives of the prisoners of the WHV and particularly EDMOND.

100.    Defendant MDOC  knew or in the exercise of reasonable care should have known that individual prison officials had engaged in misconduct and other violations of the constitutional rights of prison prisoners at the WHV, more specifically of EDMOND.

101.    Despite knowledge of its aforesaid pattern and practice, the Defendant failed to properly investigate the improper practices and to supervise and train the prison officials at the MDOC.

102.    Defendant MDOC developed a "hands off" policy or custom with regard to the omissions of individual prison officials which encouraged the individual officials to believe they could violate the constitutional rights of EDMOND with the explicit or tacit approval of the Defendant herein.

103.    As a direct and proximate result of the above cited violations of EDMOND's civil rights by Defendant MDOC, EDMOND died and thus her estate, through Sheila Clarke, has and will continue to suffer damages in the future, including, but not limited to:

    a.  Reasonable  funeral and burial expenses;

    b.  Reasonable compensation for the pain and suffering undergone by EDMOND while she was conscious during the time between her first psychiatric symptoms and his death;

    c.  Loss of comfort, society and companionship;

27

    d.  Compensatory and punitive damages; and

    e.  Any and all other damages otherwise recoverable under USC Section 1983 and Section 1988.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor and against Defendant, including punitive damages under 42 U.S.C. § 42, in excess of $75,000.00 together with interest, costs and attorney's fees.

## COUNT III

## AMERICANS WITH DISABILITIES ACT (ADA) VIOLATION – FAILURE TO ACCOMMODATE

104.  Plaintiff hereby incorporates by reference the preceding paragraphs as though fully stated herein.

105.  At all times relevant hereto, Plaintiff's decedent, EDMOND, was an individual and Defendant MDOC was a public service within the meaning of the Americans with Disabilities Act ("ADA"), being 42 USC §12131, *et seq*.

106.  At all times relevant hereto, EDMOND was a person with a disability in accordance with the ADA.

107.  EDMOND was an individual with a disability in accordance with the ADA, in that she had a mental impairment that substantially limited one or more of her major life activities.

108.  EDMOND'S disability was a major depressive disorder, suicidal ideation, and other psychological   disorders.

28

109.  At all times relevant hereto, Defendants had a duty under the ADA to accommodate EDMOND unless the accommodation would impose an undue hardship. Defendants' duty to accommodate EDMOND includes, but is not limited to, providing her with ongoing adequate medical and mental health care, and when she threatened to commit suicide, transferring her to a safe location, properly supervising and monitoring her, and providing her with a suicide prevention vest upon request.

110.  At all times relevant hereto, Defendants could have accommodated EDMOND's disability without suffering an undue hardship.

111.  As a direct and proximate result of Defendants' disability discrimination, EDMOND has suffered mental anguish, emotional distress, outrage, fear of impeding death, death, and all other damages or consequences related to the incidents set forth above.

WHEREFORE, Plaintiff, SHEILA CLARKE, as Personal Representative of the Estate of JANIKA NICHOLE EDMOND, deceased, respectfully requests this Honorable Court enter Judgment in her favor and against Defendants jointly and severally, an amount in excess of $25,000, exclusive of costs, interest, attorney fees, and punitive and/or exemplary damages.

## RELIEF REQUESTED

WHEREFORE, Plaintiff, Sheila Clarke, as Personal Representative of the Estate of Janika Edmond, deceased, respectfully requests this Honorable Court to enter

judgment in her favor and against Defendants jointly and severally, for whatever sum she is found to be entitled together with costs, interest, and attorney fees.

                              Respectfully submitted,

                              Pitt McGehee Palmer & Rivers P.C.

                    By: /s/ Cary S. McGehee
                         Cary S. McGehee P42318
                         Beth M. Rivers P33614
                         Pitt McGehee Palmer & Rivers P.C.
                         Attorneys for Plaintiff
                         117 West Fourth Street, Suite 200
                         Royal Oak, Michigan 48067
                         (248) 398-9800
                         cmcgehee@pittlawpc.com
                         brivers@pittlawpc.com


                    By: /s/ David Steingold
                         David Steingold P29752
                         Law Offices of David S. Steingold PLLC
                         Attorney for Plaintiff
                         400 Monroe St Ste 280
                         Detroit, MI 48226-2962
                         Main: (313) 962-0000
                         detroitdefender@yahoo.com



        Dated: February 17, 2017

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHEILA CLARKE, as Personal Representative
for The Estate of JANIKA NICOLE EDMOND, deceased,

      Plaintiff,

v

MICHIGAN DEPARTMENT OF CORRECTIONS,
WARDEN ANTHONY STEWART, individually and
in his official capacity, Deputy Warden, DAVID JOHNSON;
individually and in his official capacity,  Deputy Warden
OSTERHOUT, individually and in his official capacity, CO
DIANNA CALLAHAN, individually and in her official
capacity, A/RUM KORY MOORE, individually and in his
official capacity, CO R'KIA TAYLOR, individually and in his
official capacity, SGT. KRISTA SURBIC, individually and in
her official capacity,  SGT. LOREN HAILES, individually
and in his official capacity, CO HEATHER WASHINGTON,
individually and in her official capacity, CO JOHANNA
BARTEL, individually and in her official capacity, CO
ALEXIA JOHNSON, individually and in her official capacity,
CO LASHAWNA DONALD, individually and in her official
capacity, CO TRACY MAUPINS, individually and in her
official capacity, RN MARCIA PORTER, individually
and in her official capacity,

      Defendants.

Case No.:
Hon.

**DEMAND FOR JURY
TRIAL**

| | |
|---|---|
| Cary S. McGehee P42318 | David Steingold P29752 |
| Beth M. Rivers P33614 | Law Offices of David S. Steingold PLLC |
| Pitt McGehee Palmer & Rivers P.C. | Attorney for Plaintiff |
| Attorneys for Plaintiff | 400 Monroe St Ste 280 |
| 117 West Fourth Street, Suite 200 | Detroit, MI 48226-2962 |
| Royal Oak, Michigan 48067 | Main: (313) 962-0000 |
| (248) 398-9800 | detroitdefender@yahoo.com |
| cmcgehee@pittlawpc.com | |
| brivers@pittlawpc.com | |

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, Sheila Clarke, Personal Representative of the Estate of Janika Edmond, deceased, by and through her attorneys, Pitt McGehee Palmer & Rivers, P.C., hereby requests a trial by jury in this matter.

Respectfully submitted,

Pitt McGehee Palmer & Rivers P.C.

By: /s/ Cary S. McGehee
      Cary S. McGehee P42318
      Beth M. Rivers P33614
      Pitt McGehee Palmer & Rivers P.C.
      Attorneys for Plaintiff
      117 West Fourth Street, Suite 200
      Royal Oak, Michigan 48067
      (248) 398-9800
      cmcgehee@pittlawpc.com
      brivers@pittlawpc.com


By: /s/ David Steingold
      David Steingold P29752
      Law Offices of David S. Steingold PLLC
      Attorney for Plaintiff
      400 Monroe St Ste 280
      Detroit, MI 48226-2962
      Main: (313) 962-0000
      detroitdefender@yahoo.com


Dated: February 17, 2017

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was filed with the U.S. District Court through the ECF filing system and that all parties to the above cause was served via the ECF filing system on February 17, 2017.

Signature:  _____/s/ Carrie Bechill_____
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
cbechill@pittlawpc.com